207 So.2d 229 (1968)
QUINN CONSTRUCTION CO., Inc.
v.
Maurice J. SAVOIE, Anthony G. Orgeron and William M. Justice, Jr., Clerk of Court for the Parish of Jefferson.
No. 2886.
Court of Appeal of Louisiana, Fourth Circuit.
February 5, 1968.
Rehearings Denied March 4, 1968.
Writ Refused April 19, 1968.
*230 David H. Seelig, New Orleans, for plaintiff-appellee.
Jackson & Hess, Ralph N. Jackson, New Orleans, for defendants-appellants.
A. W. Wambsgans, Metairie, for William M. Justice, Jr., Clerk of Court, Parish of Jefferson.
Before REGAN, SAMUEL, and JOHNSON, JJ.
REGAN, Judge.
The plaintiff, Quinn Construction Co., Inc., filed this suit against the defendants, Maurice J. Savoie and Anthony G. Orgeron, Savoie's surety, endeavoring to recover the sum of $61,924.27, representing damages for breach of contract and the improper recordation of a laborer's lien. The plaintiff seeks the amount of $49,924.27 as the alleged difference between the cost of completion of the work contracted for by Savoie and his original contract price, and $12,000.00 as damages together with attorney's fees for the improper recordation of the lien.
The defendants answered and denied the foregoing accusations relative to the breach of their contract and reconvened endeavoring to recover the sum of $2,717.50, representing the value of labor employed and materials used in the performance of the contract by Savoie.[1]
From a judgment in favor of the plaintiff in the amount of $23,969.71, the defendants have prosecuted this appeal.
The record discloses that on December 16, 1959, the plaintiff, Quinn Construction Co., Inc., entered into a contract with the Convent of the Good Shepherd, in Bridge City, Louisiana, for the construction of several buildings in conformity with the plans and specifications prepared by Freret & Wolf, architects for the convent. The total contract price was $1,460,894.00.
On March 29, 1960, Quinn Construction Co. contracted with the defendant, Maurice J. Savoie, for the installation of all masonry work in the proposed buildings, for the price of $113,000.00. The other defendant, Anthony Orgeron, was designated in the contract as a principal, but it is conceded that he entered into the agreement as a surety and guarantor of Savoie, apparently because *231 the latter could not obtain bonding from an insurance company.
The subcontract from Quinn to Savoie provided that Savoie was to furnish all labor, insurance, scaffolding, masonry saw blades, mortar, and other equipment to install all of the masonry work in accordance with the plans and specifications executed by the owner's architect. The agreement further stipulated that all masonry units, stone, wall ties, and wall reinforcement material was to be furnished by Quinn and installed by the defendant as masonry subcontractor.
The subcontract binds both parties to the terms and conditions of the general contract. Article VII of the subcontract provides that:
"Should the Subcontractor at any time refuse or neglect to supply a sufficient number of properly skilled workmen, or a sufficient quantity of materials of proper quality, or fail, in any respect, to prosecute the work covered by this contract, with promptness and diligence, or fail in the performance of any of the agreements herein contained, the Contractor may, at his option, after forty-eight (48) hours written notice to the Subcontractor provide any such labor and materials and deduct the costs thereof, from any money then due or thereafter to become due, to the Subcontractor under this contract; or the Contractor may, at his option, terminate the employment of the Subcontractor for the said work, and shall have the right to enter upon the premises and take possession, for the purpose of completing the work included under this contract, of all materials, tools, and appliances thereon, and may employ any other person or persons to finish the work and provide the materials therefor; and in case of such discontinuance of the employment of said Subcontractor, said Subcontractor shall not be entitled to receive any further payment under this contract until the said work shall be wholly finished, at which time, if the unpaid balance of the amount to be paid under this contract exceeds the expenses incurred by the Contractor in finishing the work, such excess shall be paid by the Contractor to the Subcontractor; if such expense shall exceed such unpaid balance, then the Subcontractor shall pay the difference to the Contractor. The expense incurred by the Contractor as herein provided, either for furnishing materials or for finishing the work, and any damages incurred by such default, shall be chargeable to, and paid by, said Subcontractor and the Contractor shall have a lien upon all materials, tools and appliances, taken possession of, as aforesaid, to secure the payment thereof."
Prior to Savoie's substantial assumption of the work, he erected various sample panels of brick in order to permit the architect to decide which type of work satisfied him. The architect then selected a sample and requested Savoie to proceed in conformity therewith.
The specifications in the contract called for a 3/8 inch "flush cut" joint between the bricks and blocks in the masonry walls and facings of the buildings. The one exception to this requirement involved the masonry work around the window casings, in which location the specifications call for a "tooled" joint. In masonry terminology, a "joint" is the space filled with mortar between bricks or blocks in a masonry wall or facing. The flush cut joint is achieved when the brick mason, after laying the brick, scrapes a trowel along the face of the brick in order to eliminate excess cement from the surface thereof. This process ideally results in the surface of the mortar being approximately even with the surface of the brick. Sometimes this process leaves small holes in the mortar, commonly referred to as "bee holes", which are caused by pieces of gravel or pebble in the mortar sticking to the face of the trowel as it is passed along the base of the fresh mortar. These holes must be filled while the work is in progress or after it has been completed, in order to avoid water seepage and other complications.
A tooled joint is one in which a rounded bar or tool is passed over the fresh mortar *232 between the bricks so as to create a concave indentation in the mortar. This method involves more work for the brick mason and more time on the job, but results in a smoother finish.
To reiterate the plans and specifications called for a flush cut joint; however, the architect was dissatisfied with the appearance of this type of joint after the work commenced. He requested that the defendant substitute a tooled joint instead, and the defendant complied with this request voluntarily, irrespective of the fact that it would probably involve more cost to him. The architect was still not satisfied with the appearance of the bricks or blocks with this type of joint, and requested that the joints be rubbed with a burlap bag after partially drying in addition to the tooling. The defendant complied with this request until he was asked to discontinue it later during the course of his work.
The architect still continued to manifest disapproval of the brick work; he then requested the defendant to substitute a "rubber heel" joint in the performance thereof. This type of joint is one which is literally rubbed with a rubber shoe heel after the fresh mortar is laid in order to smooth it and give it a more uniform appearance. The defendant refused to comply with this request unless he were given an adjustment in the contract price to compensate for the extra labor cost involved in applying a rubber heel joint. A dispute subsequently ensued and the architect eventually demanded that the general contractor dismiss the defendant from the job.[2]
As a result of the architect's demand, the general contractor dismissed the defendant from the job. Thereafter, the general contractor took over the job, and completed all of the masonry work specified by the contract.
In substantiating its claim for $49,924.27 as the damages incurred as the result of having to complete the masonry work, Quinn Construction Company through its secretary treasurer, Francis P. Quinn, Jr., offered the following breakdown, most of which is supported by invoices and receipts.

 Total bills paid $ 13,956.02
 Unpaid bills
 Jahncke Service, Inc. $727.32
 H. S. Fink 232.27
 _______
 959.59
 Labor 122,303.33
 FICA State & Fed. U. C. 7,338.20
 Insurance 4,892.13
 Paid on contract 9,275.00
 To be expended:
 Labor 1,400.00
 Material 300.00
 _________
 1,700.00
 Cost of painting in lieu of cleaning & painting 2,500.00
 __________
 Total 162,924.27
 Contract -113,000.00
 ____________
 $ 49,924.27

*233 In short, the amount of damages was arrived at by subtracting the original subcontract price of $113,000.00 from the total amount of out of pocket expenditures, that is, the sum of $162,924.27.
Contrary to the defendant's contention, the preponderance of the evidence clearly discloses that the architect and the plaintiff general contractor, acting in conformity with the rationale of Article VII of the subcontract, were justified in dismissing the subcontractor from the job. In addition to the defects which he pointed out in the letter to the plaintiff demanding the defendant's dismissal, the architect related that in addition to esthetic deficiencies in the defendant's work, he was deeply concerned about the possibility of structural defects if the defendant's work proceeded in the manner in which it was going. He specifically referred to the manner in which the brick facing was tied into the cement block interior wall on every sixth row of brick. If the work was properly performed, the rows of brick had to be aligned in such a way that the level of the brick wall and the cement block upon which the tie-in brick would lay had to be of equal height. The architect asserted that the manner in which the defendant laid the bricks resulted in an uneven alignment between the brick facing and the interior block wall, so that the difference in height had to be compensated for by additional and excessively thick mortar filling between some rows of bricks. Aside from presenting an uneven and undesirable appearance, Freret asserted that if this method were pursued, serious structural problems could result. He admitted, however, that the walls were not out of line or out of plumb, and apparently restricted his complaints to the aforementioned defects.
Under these circumstances, we cannot reason, as the defendant contends, that the architect or contractor acted arbitrarily or without just cause in dismissing the defendant from the job. Moreover, the wording of Article VII of the subcontract applicable to the subcontractor certainly permits the dismissal of a subcontractor when the work is being improperly performed.
The most difficult question posed for our consideration by virtue of this appeal is involved in that portion of Article VII of the subcontract which reads:
"* * * if the unpaid balance of the amount to be paid under this contract exceeds the expenses incurred by the Contractor in finishing the work, such excess shall be paid by the Contractor to the Subcontractor; if such expense shall exceed such unpaid balance, then the Subcontractor shall pay the difference to the Contractor." (Emphasis added.)
This clause of the contract clearly permits the contractor to back charge to the subcontractor the excess of expenses over the subcontract price in the event that the contractor was forced to enter the scene and complete the work of the subcontractor. However, a fair reading of this section convinces us that the contractor can only charge back against the subcontractor the value of any work performed by it strictly in conformity with the plans and specifications provided for in the general contract. In this case, however, the preponderance of the evidence discloses that while the specifications required a flush cut joint on the masonry surfaces, the contractor used a rubber heel joint after it had fired the defendant and assumed the obligation of finishing the masonry work. The evidence reveals that the rubber heel joint was not called for in the specifications, and that such a joint is more expensive than the specified flush cut joint. Consequently, we are compelled to reach the inevitable conclusion that the contractor could not charge back against the subcontractor any more than an amount commensurate with the cost as of the time of the execution of the contract for the installation of the masonry work with a flush cut joint as opposed to a rubber heel joint. The general contractor obviously used the rubber heel joint *234 in order to satisfy the architect and to avoid unnecessary friction. While the contractor was free to do so, it cannot charge back against the subcontractor the value of work which was in excess of that called for in the specifications made part of the general contract.
A thorough analysis of the record discloses that there is not one scintilla of evidence contained therein which would enable us to ascertain the difference in the cost at the time of the execution of the contract of erecting the masonry work with a rubber heel joint as opposed to the cost of the erection thereof with a flush cut joint. Since the lower court did not offer, for our enlightenment, any reasons for its judgment, we are unable to determine how it arrived at the amount of money which it awarded to the plaintiff. It is possible that the difference in cost between a rubber heel joint as opposed to a flush cut joint, persuaded the trial judge to award the plaintiff approximately one-half of the damages which he sought over and above the original contract price. However, any such second guessing of the lower court's reasoning would be mere conjecture in which we will not indulge. Therefore, we are of the opinion that under Article VII of the subcontract, the defendant is liable to the plaintiff for any expenses incurred by it in finishing the work which was in excess of the original subcontract price. However, in ascertaining the amount of these expenses, the cost of a joint in strict conformity with the contractual specifications as of the date of the execution of the agreement must form the basis for the computation of the defendant's liability. Therefore, we are convinced that the matter must be remanded to the lower court in order that this amount may be ascertained with that certainty required by law.
The parties hereto presented several subsidiary questions by virtue of this appeal. First, the defendant insists that the plaintiff possessed no right to file a suit until it had invoked the arbitration provisions of the contract. However, this argument was not asserted until after the close of the plaintiff's case, long after the plaintiff had filed suit and long after the defendant had filed its answer and reconventional demand. In any event, the law is clear to the effect that a stipulation in a contract which provides that matters in dispute between the parties must be submitted to arbitration prior to filing suit must be pleaded in limine, and is waived by a joinder of issue without express reservation thereof.
The second subsidiary issue raised by virtue of this appeal is the time from which interest should run against the defendant. The judgment of the lower court awarded legal interest from date of judicial demand, that is, June 22, 1961. The defendant estimates that this interest would total approximately $8,500.00 to date. However, the defendant contends that under Civil Code Article 1938, interest can only be awarded to the plaintiff from the date of judgment since the amount in litigation was not a liquidated claim, and cannot become absolutely ascertainable until fixed and determined by the court in its judgment.
In the case of Sugar Field Oil. Co. v. Carter,[3] the Supreme Court of this state reasoned that a claim for an unliquidated amount did not bear interest from date of judicial demand, since it was not readily ascertainable as to quantum. In these instances, interest is allowed from the date of judgment, predicated on the rationale that the judgment itself makes the claim a liquidated one.[4] Thus, interest in this case *235 shall run in favor of the plaintiff only from the date of the judgment of the lower court on the remand hereof.
For the foregoing reasons, the judgment of the lower court is set aside and the case is remanded to the lower court for the purpose of adducing evidence to determine what the masonry work would have cost to complete if a flush cut joint had been used by the plaintiff in accordance with the contractual specifications. In addition thereto, the matter is remanded to the lower court in conformity with the views herein expressed and for such additional proceedings as the nature of the case may ultimately require, with interest to run from the date of the judgment on remand.
All costs of this appeal are to be paid by the plaintiff. All other costs are to await the final determination hereof.
Set aside and remanded.
NOTES
[1] The defendant filed a lien against the buildings upon which he worked for this amount, and this is the same lien for which the plaintiff seeks damages because of its recordation.
[2] The architect complained to the general contractor, Quinn, that chipped blocks were being installed in the walls as well as blocks of rough texture; the joints in the block walls were not uniform; that the mortar in some cases had holes, and in other cases was smeared on the face of the blocks; and that the faces of the blocks, in some instances were not in true alignment.
[3] 214 La. 586, 38 So.2d 249 (1948).
[4] See also Pittman and Matheny v. Davidge, La.App., 189 So.2d 706 (1966); McCann v. Todd, 203 La. 631, 14 So.2d 469 (1943); Couvillon v. Whitney National Bank of New Orleans, 218 La. 1096, 51 So.2d 798 (1951). An exception to this rule is provided by R.S. 13:4203 which provides for interest from date of judicial demand on all judgments sounding in tort.