341 So.2d 421 (1976)
Benny MAY, Plaintiff and Appellant,
v.
The SOUTHLAND CORPORATION et al., Defendants and Appellees.
No. 5682.
Court of Appeal of Louisiana, Third Circuit.
December 31, 1976.
Rehearing Denied January 26, 1977.
Writ Refused March 11, 1977.
*422 Stafford, Randow, O'Neal & Scott by Hodge O'Neal, III, Alexandria, for plaintiff and appellant.
Booth, Lockard, Jack, Pleasant & LeSage by Joe LeSage, Jr., Shreveport, for defendants and appellees.
Before CULPEPPER, WATSON and HUMPHRIES, JJ.
CULPEPPER, Judge.
Plaintiff filed this suit alleging that as a route salesman for the defendant corporations he is entitled to recover compensation under the terms of a collective bargaining agreement between the corporations and a Teamster's Union. After defendants denied plaintiff was their employee, but was instead an employee of their route salesman, James E. Martin, plaintiff named Martin as an additional defendant. The trial judge held that although plaintiff was an employee of defendant corporations, and not of Martin, his demands must be rejected because he was not a member of the union which entered into the collective bargaining agreement. Plaintiff appealed.
The issues are: (1) Does this Court have jurisdiction over the subject matter of this lawsuit, or is exclusive jurisdiction vested in the National Labor Relations Board? (2) Was plaintiff an employee of defendant corporations or was he instead an employee of defendant, James E. Martin? (3) What law (State Contract Law, Federal Labor Law, or a combination of the two), should be applied to determine plaintiff's rights under the subject collective bargaining agreement? (4) Does plaintiff, who was not a member of the contracting union, have a cause of action against his employer for the difference between the 5% commission he was actually paid and the 8% commission stipulated in the collective bargaining agreement? (5) May plaintiff's alleged failure to invoke the compulsory arbitration procedure of the collective bargaining agreement be raised on appeal, or did defendants waive this objection by their failure to timely file the dilatory exception of prematurity? Plaintiff does not on appeal seek judgment against James E. Martin.

FACTS
Defendants, Midwest Farms, Inc., and Midwest Dairy Products, Inc., both subsidiaries *423 of defendant Southland Corporation (collectively referred to as "the Company"), are engaged in the production, processing and sale of dairy products. The Company employs route salesmen to service its wholesale dairy products customers. From an office in Shreveport, the Company supervises wholesale activities in surrounding parishes, including Sabine Parish.
A collective bargaining agreement between the Company and the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local Union No. 568 (the Union), was in effect from April 16, 1972 to April 15, 1975. This agreement provides in Article 18.1: "Wholesale milk route salesmen shall receive a commission of 8% on all gross sales except schools, hospitals and government bid business which shall be paid at 8% on net sales." Article 1.4 of the contract embodies a union security agreement commonly referred to as a "Union Shop" clause. This union shop clause requires that all employees of the Company became union members within one month of the date they are employed.
Defendant, James E. Martin, is a member of the union. He is classified as a "route salesman". He began working for the Company over 25 years ago under the terms of an oral contract providing that he would receive a commission of 8% of wholesale dairy product sales in Sabine Parish. When he first started working for the Company, he was apparently the only route salesman in Sabine Parish. His base of operation was Many, Louisiana.
In the beginning, Martin serviced his Sabine Parish territory with only one truck, which he drove himself. Business flourished, and in 1960 a second delivery truck was added to the Sabine Parish operation. In 1963 a third truck was added. The Company owned these trucks.
With the addition of two trucks, Martin's duties changed from those of a route salesman to those of a supervisor of route salesmen. He no longer drove a delivery truck himself but instead directed the activities of three route salesmen. The record is unclear as to the exact date that Martin quit driving a delivery truck and personally servicing his customers, but it appears that this event took place in 1963. Despite the change in his duties from route salesman to supervisor, Martin remained a union member classified as a "route salesman".
In his supervisory capacity, Martin selected and trained the route salesmen who drove the additional delivery trucks. Plaintiff, Benny May, was hired by Martin on July 29, of 1972. Plaintiff's job classification, his union membership status, and the question of whether he was the employee of defendant corporations or of defendant, James Martin, are discussed in detail later in this opinion. For the present, however, we can say that Benny May was hired as a "route salesman". During the first four months of his employment, May was paid $2 per hour. Thereafter, and until his dismissal on September 20, 1974, the hourly rate was discontinued and May was paid a commission of 5% of his sales. May was apparently satisfied with his 5% commission arrangement until a transport driver delivering company products to Many told him of the existence of the union and of the provisions of the union contract setting route salesmen's commissions at 8%. The collective bargaining agreement was in effect during the entire period of May's employment.
Plaintiff's fellow Sabine Parish route salesmen, Koss and Knowles, also received a commission of 5%. They, too, were supervised by James Martin. After learning the union contract sets commissions for route salesmen at 8%, Koss and Knowles shared plaintiff's discontent. May, Koss and Knowles discussed their commission arrangement and decided to travel to Shreveport to explain their situation to officials of Teamsters Local 568. In Shreveport, May and the others met with the union steward and told him of their desire to join the union. The union steward made no determination concerning their eligibility for union membership, but he did supply the three men with union application forms which were subsequently completed and returned *424 to the Union. With the exception of May, none of the three testified that the Union acted favorably on his application. May testified that he received a Union card but did not produce the card for introduction into evidence at trial. The trial judge held May did not prove he was a union member. We find no manifest error in this factual conclusion.
On May 25, 1975, plaintiff filed a petition praying that The Southland Corporation, Midwest Farms, Inc. and Midwest Dairy Products, Inc. be ordered to pay him the sum of $12,525.40, the alleged difference between the 5% commission rate actually paid plaintiff during the term of his employment and the 8% rate which plaintiff claims he is entitled to under the provisions of the collective bargaining agreement.

JURISDICTION
Defendants do not concede that Louisiana courts have jurisdiction to hear this suit. The argument is that since the National Labor Relations Act endows the National Labor Relations Board with exclusive jurisdiction over certain labor disputes affecting interstate commerce, our state courts have no jurisdiction in the present case. We do not agree.
Apparently, defendants' argument is based upon the fact that this suit arises under Section 301 of the Labor Management Relations Act, 29 U.S.C.A., Section 185, which provides:
(a) Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.
From the above, we conclude that the present case does arise within the purview of Section 301. This is a suit for an alleged violation or breach of a contract between a defendant employer and the Union. Defendants state in their brief before this Court: "Midwest and Southland Corporation are of course actively involved in interstate commerce. Midwest distributes ice cream products in Texas and Wisconsin."
Although we have concluded that this action does arise within the purview of Section 301, we cannot agree that the NLRB and the Federal courts are endowed with exclusive jurisdiction over this type of suit.
In Rust Engineering Company v. United Brotherhood of Carpenters and Joiners of America, 210 So.2d 154 (La.App. 3rd Cir. 1968), this Court entertained a jurisdictional challenge similar to the present one. The defendant-employer in Rust contended that the breach or violation of the collective bargaining agreement alleged by plaintiff was arguably an unfair labor practice which came under the exclusive jurisdiction of the NLRB, thereby pre-empting any state or federal court from hearing the action. We rejected defendant's argument holding:
"It appears well settled . . . that state courts possess jurisdiction concurrent with that of federal courts in regard to suits to enforce labor contracts. Charles Dowd Box Company v. Courtney, 368 U.S. 502, 82 S.Ct. 519, 7 L.Ed. 483 (1962). While Section 301 of the Labor Management Relations Act (29 USCA, Section 185) gave federal courts jurisdiction to hear cases involving a breach of a labor contract, that act nowise limited the pre-existing jurisdiction of state courts to enforce labor contracts." 210 So.2d 154, 156.
The Courtney case was our primary authority for upholding state court jurisdiction in the Rust Engineering case. Recently, in William E. Arnold Company v. Carpenter's District Council of Jacksonville & Vicinity, 417 U.S. 12, 16, 94 S.Ct. 2069, 2072, 40 L.Ed.2d 620 (1974), the United States Supreme Court reaffirmed the jurisdictional rule laid down in Courtney, stating:
"When . . . the activity in question also constitutes a breach of a collective bargaining agreement, the Board's authority `is not exclusive and does not destroy *425 the jurisdiction of the courts in suits under § 301.' Smith v. Evening News Association, supra, 371 U.S., at 197, 83 S.Ct., at 269. . . . (A)ctions within the purview of § 301 . . . may be brought in either state or federal courts. Dowd Box Co. v. Courtney, supra. . . .'
Numerous other cases hold, as we do, that suits arising within the purview of Section 301 to enforce provisions of collective bargaining agreements may be brought in either state or federal courts. Smith v. Evening News Association, 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962); Local 174, Teamsters Warehousemen and Helpers of America v. Lucas Flour Company, 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962); Springer v. Powder Power Tool Corporation, 220 Or. 102, 348 P.2d 1112 (1960); Bridges v. F. H. McGraw & Company, 302 S.W.2d 109 (Ky.App.1957).
In Talbot v. National Super Markets of Louisiana, 372 F.Supp. 1050 (E.D.La.1974), Judge Rubin was faced with the following question in connection with a motion to remand a case removed from a Louisiana state district court: Can a suit brought by individuals, not by their union, be considered as a claim under Section 301? The individual employees were suing for wages allegedly due under the terms of a collective bargaining agreement. Citing Smith v. Evening News, supra, the court held that the suit did arise under Section 301 and that both the state and federal district courts had jurisdiction. See also Serra v. Pepsi-Cola General Bottlers, Inc., 248 F.Supp. 684 (D.C.1II.1965).
Considering the above, we hold that we have jurisdiction to hear plaintiff's case.

BY WHOM WAS MAY EMPLOYED?
May was an employee of the Company rather than of James E. Martin. The trial judge reached the same conclusion, summarizing the relevant facts as follows:
"Plaintiff was actually hired by Mr. Martin, acting on behalf of Midwest, and in this connection made his application for employment on a Midwest application form.
"Midwest assigned him an employee number, assigned him a route, kept his sales figures, calculated his commission in its office in Shreveport, and then paid Plaintiff directly by checks issued on Southland, the parent company. Necessary payroll deductions were made by Midwest in its Shreveport office.
"Plaintiff drove a Midwest truck, used Midwest Equipment, sold Midwest milk, and took orders from James E. Martin, a Midwest supervisory employee.
"Plaintiff was not an employee of James E. Martin. He was an employee of Midwest from July 29, 1972, through September 19, 1974."
Clearly, James Martin was simply an agent of the Company and had authority to hire, fire and supervise route salesmen in his Sabine Parish sales territory.

WHAT LAW SHOULD BE APPLIED?
We have concluded that this action to enforce the terms of a collective bargaining agreement arises within the purview of Section 301 of the NLRA. We have also concluded that plaintiff was an employee of the defendant corporations. The next question concerns what law we should apply to determine May's rights under the collective bargaining agreement. In supplemental briefs before this Court, plaintiff argues that a mixture of state contract law and substantive federal labor law are applicable. Defendants argue that only substantive federal law applies. We think the U.S. Supreme Court answered this question in the Lucas Flour case, supra. The Supreme Court noted that the action, a suit for violation of a collective bargaining agreement, arose within the purview of Section 301(a) of the NLRA. The court was then faced with this question: "Was the Washington (Supreme) Court free, as it thought, to decide the question within the limited horizon of its local law?" Justice Stewart answered for the court explaining:
In Dowd Box we proceeded upon the hypothesis that state courts would apply *426 federal law in exercising jurisdiction over litigation within the purview of § 301(a), although in that case there was no claim of any variance in relevant legal principles as between the federal law and that of Massachusetts. In the present case, by contrast, the Washington court held that there was nothing in § 301 "limiting the substantive law to be applied," and the court accordingly proceeded to dispose of this litigation exclusively in terms of local contract law.
See also Textile Workers of America v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972.
In Lucas Flour, the court grounded its decision on the need for uniform law, stating: [I]n enacting Section 301 (of the NLRA), Congress intended doctrines of federal labor law uniformly to prevail over inconsistent state rules." In the present case the district judge apparently relied on the general rule of Louisiana contract law that a person is neither bound by, nor entitled to the benefits of, a contract to which he is not a party. Plaintiff argues that we could apply the Louisiana law of stipulations for the benefit of third persons, LSA-C.C. Articles 1890 and 1902, to find that he is entitled to the benefits of the union contract. We conclude under the uniformity rule of Lucas Flour, quoted above, that in the present case any state law which would deny plaintiff the benefits of the collective bargaining agreement would be inconsistent with, and must yield to, the Federal labor law that the benefits of the agreement extend to all employees, regardless of union membership.

MAY'S RIGHTS UNDER THE COLLECTIVE BARGAINING AGREEMENT
Originally, defendants argued that May negotiated his own contract of employment and was not entitled to enforce the commission payment provisions of the Union contract because he was not a member of the union. Union membership, however, is not the critical factor in determining whether an employee may enforce the provisions of a collective bargaining agreement. The critical factor is whether the employee is within the bargaining unit contemplated by the contract.
In their supplemental briefs before this Court, defendants concede that:
". . . it would appear inescapable that plaintiff-appellant May, as a member of the bargaining unit, would be entitled, under federal law, to invoke the provisions of the collective bargaining agreement in force and effect, without the necessity of being a union member. "Thus, we must answer that indeed plaintiff-appellant may invoke the provisions of the collective bargaining contract in existence between the Union and the defendants-appellees."
We agree with defendants' assessment of this issue for the reasons which follow: In J. I. Case Company v. NLRB, 321 U.S. 332, 64 S.Ct. 576, 88 L.Ed. 762 (1944), the United States Supreme Court explained that the terms of collective bargaining agreements inure to the benefit of all employees within the bargaining unit. We quote at length from the court's opinion in J. I. Case, because we think it succinctly outlines applicable Federal labor law doctrine:
"Contract in labor law is a term the implications of which must be determined from the connection in which it appears. Collective bargaining between employer and the representatives of a unit, usually a union, results in an accord as to terms which will govern hiring and work and pay in that unit. The result is not, however, a contract of employment except in rare cases; no one has a job by reason of it and no obligation to any individual ordinarily comes into existence from it alone. The negotiations between union and management result in what often has been called a trade agreement, rather than in a contract of employment. Without pushing the analogy too far, the agreement may be likened to the tariffs established by a carrier, to standard provisions prescribed by supervising authorities for insurance policies, or to utility schedules of rates and rules for service, *427 which do not of themselves establish any relationships but which do govern the terms of the shipper or insurer or customer relationship whenever and with whomever it may be established. . . .
"After the collective trade agreement is made, the individuals who shall benefit by it are identified by individual hirings. The employer, except as restricted by the collective agreement itself and except that he must engage in no unfair labor practice or discrimination, is free to select those he will employ or discharge. But the terms of the employment already have been traded out. There is little left to individual agreement except the act of hiring. This hiring may be by writing or by word of mouth or may be implied from conduct. In the sense of contracts of hiring, individual contracts between the employer and employee are not forbidden, but indeed are necessitated by the collective bargaining procedure.
"But, however engaged, an employee becomes entitled by virtue of the Labor Relations Act somewhat as a third party beneficiary to all benefits of the collective trade agreement, even if on his own he would yield to less favorable terms. The individual hiring contract is subsidiary to the terms of the trade agreement and may not waive any of its benefits, any more than a shipper can contract away the benefit of filed tariffs, the insurer the benefit of standard provisions, or the utility customer the benefit of legally established rates.

* * * * * *
It is equally clear since the collective trade agreement is to serve the purpose contemplated by the Act, the individual contract cannot be effective as a waiver of any benefit to which the employee otherwise would be entitled under the trade agreement. The very purpose of providing by statute for the collective agreement is to supersede the terms of separate agreements of employees with terms which reflect the strength and bargaining power and serve the welfare of the group. Its benefits and advantages are open to every employee of the represented unit, whatever the type or terms of his pre-existing contract of employment." (Emphasis added)
Section 9(a) of the NLRA, 29 U.S.C.A., Section 159(a) also clearly states that the exclusive representative of all employees in a bargaining unit, without reference to their union membership status, is a representative chosen for collective bargaining purposes by a majority of the employees in the bargaining unit:
"159. Representatives and electionsExclusive representatives; employees' adjustment of grievances directly with employer
"(a) Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment." (Emphasis supplied)
Several cases in both Federal and State courts hold that a collective bargaining agreement between an employer and a labor union may be enforced by an individual employee within the scope of the agreement, even though the employee is not a member of the union. Defendants concede this point in their supplemental briefs before this Court. In the majority of cases on this issue, the courts allow the individual to sue on the agreement itself on the theory that it is a third party beneficiary contract between the employer and union for the benefit of all employees within its intended scope. See Yazoo & M.V.R.R. v. Webb, 64 F.2d 902 (5th Cir. 1933); Springer v. Powder Power Tool Corp., supra (Or.S.Ct.1960), reversing its earlier decision holding that a non-union employee could not sue on a union contract, on the grounds that the earlier case yielded to modern developments in the law of labor relations. Leahy v. Smith, 290 P.2d 679 (Cal.App.1955); Knudsen v. Chicago & Northwestern Railway Company, 106 F.Supp. 48 (N.D.Ill.1952), involving the *428 Railway Labor Act; Richardson v. Communication Workers of America, 443 F.2d 974 (8th Cir. 1971), cert. denied 414 U.S. 818, 94 S.Ct. 38, 38 L.Ed.2d 50. See also 18 A.L.R.2d 355, 370 and cases cited therein.
These cases are consistent with the Supreme Court's interpretation of the NLRA which emphasizes membership in the bargaining unit rather than union membership status. J. I. Case Company, supra. Therefore, we hold that May, as a member of the bargaining unit, has a cause of action against defendants for the difference between the amount actually paid to him and the amount he was entitled to as a member of the bargaining unit covered by the collective bargaining agreement.
As we previously stated, defendants concede that May was a member of the bargaining unit. Defendants do not concede, however, that May was a "route salesman" entitled to the 8% commission stipulated in Article 18.1 of the contract. Defendants contend that May was a "helper" rather than a "route salesman". There is no merit in this argument.
Classification of employees, according to the testimony of the Company's Shreveport zone manager and its personnel director, is dependent upon the type of work performed by the employee. Article 16.1 of the contract, which deals with plant employees rather than with the Wholesale Milk Department, provides:

"ARTICLE 16

Plant Compensation
"Section 16.1 CLASSIFICATION Present employees of both the Milk Department and the Ice Cream Department are to be assigned proper job classifications, as determined by the duties performed. In determining the proper classifications the job upon which the employee expends fifty-one (51) percent of his time or more, will control."
Although this section does not apply to the Company's Wholesale Milk Department, it does indicate the parties to the contract intended that employees be classified according to duties performed.
Testimony adduced at trial shows that the duties of route salesmen who were union members coincided with plaintiff's duties. The following duties and activities, which amount to a complete job description, were common to plaintiff and his union counterparts:
1. Take customers' orders for delivery of dairy products;
2. Delivery dairy products;
3. Collect and forward to the Company the cash payments due on charge accounts;
4. Check the freshness codes on dairy products;
5. Service the customers (i.e., rotate stock, replace spoilage, etc.);
6. Post advertising material;
7. Solicit new business;
8. Post a bond with the Company to cover shortages arising in the course of collection activities.
Since the classification scheme is based upon duties performed, May was a "route salesman". The trial court reached the same conclusion, stating, "In practicality, he (May) performed all the duties of a milk route salesman."
Defendants' reliance on Article 17 of the contract as a vehicle for classifying May a "helper" rather than a "route salesman" is unfounded. The heading or title above the text of Article 17 is "Unskilled Temporary Help". The text reads:
"Unskilled or extra help for the milk department or ice cream department may be hired. This article will not be used as a subterfuge." (Emphasis supplied)
There are three reasons that May cannot be considered a "helper" within the meaning of Article 17. First, plaintiff was hired as a permanent employee rather than a temporary employee. Second, the Company's use of the provisions to classify a "route salesman" as a "helper" to avoid the payment of the 8% commission stipulated in the contract amounts to a subterfuge. Third, from our reading of the contract as a whole, it appears that Article 17 applies *429 only to the production "Milk Department", not to the "Wholesale Milk Department".
As a route salesman, plaintiff is entitled to the difference between the 5% commission he was paid and the 8% commission stipulated in the collective bargaining agreement.

THE EFFECT OF THE ARBITRATION CLAUSE
Defendants argue that this Court is without jurisdiction in the present case because plaintiff failed to exhaust compulsory grievance and arbitration procedures mandated by Articles 30.1 and 30.4 of the collective bargaining agreement. Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). We need not address the merits of this argument, however, as it may be disposed of upon procedural grounds.
The dilatory exception of prematurity is a threshold device designed to terminate an action brought before the right to enforce it has accrued. LSA-C.C.P. Articles 926(1) and 423. Failure to abide by contractual compulsory arbitration provisions and failure to exhaust administrative remedies are defenses which are properly raised through the dilatory exceptions of prematurity. Such an exception must be filed before answer or judgment of default under penalty of waiver. LSA-C.C.P. 926, 928; Lee v. Blackwell, 286 So.2d 185 (La.App. 4th Cir. 1973); Quinn Construction Company, Inc. v. Savoie, 207 So.2d 229 (La.App. 4th Cir. 1968); writ refused; Stone v. Stone, 281 So.2d 177 (La.App. 4th Cir. 1973), reversed on other grounds 292 So.2d 686 (La.1973); Buquoi v. Hampton, 6 Mart., N.S. 8 (1827). See also Sim v. Beauregard Electric Co-op, Inc., 322 So.2d 410 (La.App. 3rd Cir. 1975); Superior Oil v. Humble Oil & Refining Company, 257 La. 207, 241 So.2d 911 (1970), and Steeg v. Lawyers Title Insurance Corporation, 329 So.2d 719 (La.1976). Therefore, we hold that defendants waived their right to object to plaintiff's alleged failure to exhaust grievance and arbitration procedures or other administrative remedies by failing to timely file a dilatory exception of prematurity.
Before addressing the issue of the amount of commission due to May, we feel a comment about defendants' argument concerning May's alleged failure to invoke arbitration procedure is appropriate. May apparently attempted to use the grievance and arbitration procedure specified in the contract. He explained his situation to both a union steward and to Company officials, and was rebuffed by both. The Union's indifference is evidenced by its apparent failure to process May's application for membership. Perhaps by its inaction, the Union breached its statutory duty to fairly represent May as a member of the bargaining unit. At any rate, it appears to us that further attempts to institute grievance or arbitration procedure would have been an exercise in futility. These issues, however, are not before us.
Neither party has cited our recent decision in Colbert v. Mike-Baker Brick Company of New Iberia, Inc., 326 So.2d 900 (La.App.3rd Cir. 1976) as authority for any argument, but we think the case should be distinguished from the present one. Colbert, an employee of defendant Brick Company filed suit under a collective bargaining agreement for wages due but not paid within 24 hours of discharge. He sought penalties under the State statute, LSA-R.S. 23:681-682. At the outset, we found there was no allegation nor proof that the defendant employer was engaged in interstate commerce. Therefore, the Colbert case did not arise within the purview of Section 301 of the NLRA, as the present suit does. Accordingly, we applied State Contract Law and LSA-R.S. 23:631-632 in Colbert. In the present case, which is a suit for violation of a collective bargaining agreement between the employer and the union, we are obliged to apply substantive Federal Labor Law.

QUANTUM
Article 18.1 of the collective bargaining agreement provides:

"ARTICLE 18

Wholesale Milk Compensation
*430 "Section 18.1 Wholesale Milk Route Salesmen shall receive a commission of 8% on all gross sales except school, hospital and government bid business which shall be paid 8% commission on all net sales."
The record shows that from December, 1972 until his dismissal on September 24, 1974, May was paid a commission of 5% of his gross sales. According to the testimony of James Martin and company officials, this 5% commission was an "assignment" of a portion of the commission due to Martin as an officially recognized "route salesman". Therefore, in order to compute the difference between the 5% commission paid to May and the 8% he was entitled to under the collective bargaining agreement, we begin by calculating his total income during the period he received the 5% commission. According to defendants' payroll ledger, the total amount of gross pay during that period is $20,189.64 ($633.26 in December of 1972, $10,053.58 in 1973, and $9,502.80 in 1974). If plaintiff had been paid an 8% commission during the same period, his gross pay would have been approximately $32,303.00. Plaintiff is therefore entitled to $12,113.36, the difference between the 5% rate he was actually paid and the 8% rate to which he was entitled under the contract.
Plaintiff was paid $2 per hour during the months of August, September, October and November of 1972. Since plaintiff was not paid a commission during this period, it will be impossible to "work backward" from his gross pay to compute the commission due him. The record contains data sheets showing May's daily sales, but these records do not begin until November 27, 1972. Therefore, plaintiff has failed to supply evidence from which his sales commissions for August, September, October and November of 1972 can be computed. We note, however, that Article 18.3 of the collective bargaining agreement states:
"Section 18.3 The minimum pay for all wholesale route salesmen, after the route has been turned over to them shall be one hundred twenty-five ($125.00) Dollars per week. Relief route salesmen shall receive a minimum of one hundred twenty-five ($125.00) Dollars per week."
During the months of August, September, October and November of 1972, May worked approximately 18 weeks and earned a total gross pay of $2,333.97, according to the Company payroll ledger. His gross pay at $125 per week would have been $2,250.00 during the same period. Since May failed to prove his sales for this period, and because his actual gross pay totaled more than the $125 per week he was entitled to under the contract, May's award will be limited to the amount previously computed, $12,113.26.

DECREE
For the reasons assigned, the judgment of the district court is reversed and set aside. Judgment is now rendered in favor of the plaintiff, Benny May, and against the defendants, The Southland Corporation, Midwest Farms, Inc. and Midwest Dairy Products, Inc., jointly and in solido for the sum of $12,113.26, plus legal interest from date of judicial demand until paid. All costs in the trial and appellate courts are assessed against the defendants.
REVERSED AND RENDERED.